# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **CALVIN THOMAS,** | : | **Case No. 1:05-CV-02138** |
| | : | |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| | : | |
| **THISTLEDOWN, Inc.,** *et al.*, | : | <u>**ORDER & OPINION**</u> |
| | : | |
| | : | |
| **Defendants.** | : | |

Before the Court is Plaintiff Calvin Thomas' ("Thomas") Motion for Reconsideration. (Thomas' Br. of February 27, 2009 (Doc. 63).) In that motion, Thomas asks this Court to reconsider the scope of its previously issued injunction (*see* Court Order of February 20, 2009 (Doc. 62)) as well as what Thomas' current attorney, Caryn Groedel ("Groedel"), characterizes as the Court's "attacks" against her.[1] In response, Non-Party Avery Friedman ("Friedman") asks this Court not only to deny Thomas' motion, but also to sanction Groedel for misconduct and to exercise its discretion to take jurisdiction over a pending state court action. (Friedman's Br. of March 10, 2009 (Doc. 65).)[2] Thomas, in turn, asks this Court to sanction Friedman's attorney, James P. Sammon ("Sammon"). (Thomas' Br. of March 19, 2009 (Doc. 70).)[3]

---

[1] Friedman had asked this Court to stay a pending state court action (Friedman's Br. of March 6, 2009 (Doc. 64)), but the state court has since stayed its own proceedings (Joint Stipulation of June 10, 2009 (Doc. 72)).

[2] Non-Party Sarah Moore ("Moore") asks this Court to deny Thomas' motion as well. (Moore's Br. of March 13, 2009 (Doc. 67).)

[3] The motion is styled as a motion for sanctions against Friedman. Its content, however, makes clear that it is properly understood as being directed at Sammon.

For reasons more fully explained below, Thomas' motion for reconsideration (Doc. 63) is **DENIED**, although the Court **SUBSTITUTES** this opinion for its February 20, 2009 Order (Doc. 62).[4] The Court declines to take jurisdiction over the pending state court action, and Friedman's Motion for Sanctions and Request to Take Jurisdiction (Doc. 65) is **DENIED**.  Thomas' Motion for Sanctions (Doc. 65), too, is **DENIED** (Doc. 70) and Friedman's Motion to Stay (Doc. 64) is **MOOT**.

## I.  BACKGROUND

Thomas filed a complaint on September 8, 2005, alleging discrimination and retaliation against Defendants Thistledown, Inc., William Murphy, and John Durastanti (collectively, "Thistledown"). (Doc. 2.)  Thomas was represented in the initial action by both Friedman and Moore.  On March 24, 2006, after the parties had undergone some discovery, Thistledown filed their Motion for Summary Judgment. (Doc. 21.)  On April 13, 2006, before Thomas was required to respond to Thistledown's Motion for Summary Judgment, the parties met for a settlement conference with the late Honorable John M. Manos.  As a result of the settlement conference, counsel for both parties signed a stipulated entry of settlement and dismissal with prejudice.  Judge Manos signed the entry into an Order, dismissed the action with

---

[4] The Court will analyze all issues raised throughout the briefing on this matter concurrently, rather than somewhat artificially dividing this Order into issues raised only during the initial briefing and issues raised during the motion for reconsideration.  The Court notes, however, that the motion for reconsideration raised only three issues: (1) whether all of the facts that the Court concluded were "actually litigated" were, indeed, "actually litigated"; (2) whether an injunction would create a "manifest injustice" (arguably, this is not a separate argument but simply part of Thomas' other arguments, although, out of an abundance of caution, the Court will consider it as a separate contention); and (3) whether the February 20, 2009 Court Order contained unfair "attacks" against Thomas' current counsel. (*See generally* Thomas Br. of February 27, 2009.)

The Court also wishes to make explicit that it substitutes this order for its original only so as enable the most straightforward possible appellate review if such review is deemed necessary.  As explained more fully below, the Court has reviewed, carefully, its original opinion and is perplexed as to why Thomas finds it objectionable language.  The vast majority of the language from the Court's original opinion, indeed, is replicated in this opinion.

prejudice, and agreed to retain jurisdiction over the settlement agreement. (Court Order of April 14, 2006 (Doc. 22).)

On June 22, 2006, Thomas, through Groedel, filed a Motion for Relief from Judgment and Request for Hearing. (Doc. 25.)

On October 27, 2006, this Court held a hearing on Plaintiff's motion.  During the hearing, Thomas called three witnesses (Thomas, Thomas' brother, and Thomas' sister) and rested.[5]  Although Thomas completed his case-in-chief, Thistledown did not have the opportunity to present their entire case because Groedel made certain allegations of unethical conduct directed towards Thistledown's first witness, Moore.  (*See* Court Order of November 30, 2006 (Doc. 38).)[6]  Specifically, Groedel argued that only contingency fee lawyers could be trusted to zealously represent their clients, because contingency fee lawyers had a financial stake in the outcome of the case.  (*Id*. at 2 n.3)  In response, Moore requested the right to retain counsel to advise her regarding the appropriate response to those allegations.  The Court informed Groedel that the ethical attacks she was making were irrelevant and asked her to continue her examination with reference only to the facts – i.e., what factually occurred during Friedman and Moore's representation of Thomas – without reference to Groedel's personal judgments as to those facts. When Groedel continued her ethical attacks and chose not to further develop the factual record, the Court concluded the hearing to allow Moore the opportunity to retain counsel.

On November 30, 2006, the Court issued an Order explaining that, although it had initially intended to reconvene to complete the hearing, it found it unnecessary to do so because the Plaintiff had

---

[5] Friedman and Moore were present but were not called to the stand.

[6] In its written filings and arguments to the Court, Thistledown argued that Judge Manos actually convinced it to increase its settlement offer to $7500, despite its belief that the matter previously had been settled between the parties for less, and despite its belief that the $7500 figure was unreasonable. Ultimately, given the strength of Thomas' claims, the Court did not engaged in an analysis of the merits of the underlying action, focusing instead only on whether an agreement to end the litigation had occurred.

failed to carry his burden under Rule 60(b). (*Id*.) The Court did not rely on Moore's testimony and, instead, based its conclusions on the representations of the actual participants in the settlement conference.

In the Court's November 30, 2006 Order, the Court considered whether Thomas should be allowed to reopen the judgment in his case under Rule 60(b). After weighing Thomas' arguments, including his claim that he had not knowingly entered into a settlement agreement, the Court declined to reopen Thomas' civil action. (*Id*.)

On October 2, 2007, Thomas filed an 11-count complaint against Friedman and Moore (*Thomas v. Friedman*, No. 07-626137). This complaint, pending before Cuyahoga County Court of Common Pleas Judge Peter J. Corrigan, alleges that Friedman and Moore's negligence "ultimately resulted in the dismissal, with prejudice . . . [of] *Calvin Thomas v. Thistledown*, No. 05-CV-21378." (No. 07-626137 Doc. 1 ("Ex. A") at ¶ 10.) The complaint further claims that "[Friedman and Moore] accepted [a nuisance value settlement] without Plaintiff's express knowledge and understanding." (*Id*. at ¶ 11.) It is clear that one aspect of Thomas' state court action, although by no means its only aspect, is the assertion that he did not knowingly enter into the settlement agreement in the instant action. (*See, e.g.*, Friedman's Br. of February 5, 2009 at 1 (Doc. 59).)[7]

---

[7] Plaintiff has filed a motion to strike this filing (Doc. 59), containing correspondence between the Plaintiff and Chief Judge Carr, from the record because it was filed with the Court after the Court's initial deadline for receiving filings related to this motion. (*See* Thomas' Br. of February 6, 2009 (Doc. 60).) This Motion is **DENIED**. Thomas' filing does not attempt to enumerate any manner in which consideration of this filing would harm the Plaintiff, nor could he. This filing (Doc. 59) is in response to certain unexpected representations Thomas made during the hearing on February 3, 2009. At that hearing, Thomas strongly suggested that he did not intend to assert that he was asking the state court to revisit the question of whether he knowingly entered into the *Thistledown* settlement, in contrast to representations made to Judge Corrigan and Chief Judge Carr.

Although the Court always has the power to disregard filings it receives after Court-imposed deadlines and, frequently, a duty to exercise that power to prevent prejudice to parties who comply with this Court's orders, Friedman could not have anticipated that Thomas would make representations during

On January 13, 2009, Friedman and Moore filed a motion in state court asking Judge Corrigan to apply the doctrine of collateral estoppel and give preclusive effect to this Court's conclusions in *Thistledown*.  (*See* Doc. 39 Ex. C.)  On January 20, 2009, after a brief hearing on the record, Judge Corrigan denied this motion.[8]  Judge Corrigan ruled:

> I don't think collateral estoppel is applicable in this case. With respect to that hearing, there were different issues that were being adjudicated. There may be the same facts as part of this case, which I have ruled are admissible and that this jury should hear about those facts. What I've excluded is the judge's conclusion about those facts and her legal analysis whether or not a [60(b)] motion should be granted or not. During that hearing – and I read the transcript – which was not even finished – the hearing wasn't finished. The hearing was stopped in the middle of Mr. Avery's witness who was called, Miss Moore, that those conclusions the judge made were irrelevant to the issues that these jurors are going to determine. . . .
>
> It's not that I precluded it. It's – recall that, you know, it's a prior court proceeding. If there is impeachment evidence in that transcript, obviously that may be relevant at some point if the same witness testifies differently here in this case. . . .
>
> [T]he court's order, ruling, is that the legal conclusion of whether there's a settlement or not is being excluded.  The facts surrounding any discussion regarding whether or not the case was concluded or a settlement of what was understood by those conversations is the issue in the case.

(No. 07-636137 Hrg. Tr. of January 20, 2009.)  At that time, Moore's attorney proffered an objection for the record:

> If the opinion and order are not admitted into evidence and if the witness is not available for us to call, that that permits the plaintiff in this case to deny that a settlement occurred in Judge Manos's chambers in April of 2006 when at page 9 of the opinion and order Judge O'Malley writes, "Ultimately the court finds that the parties entered into a binding settlement agreement the terms of which are memorialized in the general release of claims and settlement agreement attached to a certain letter."  So the plaintiff here is going to be permitted in this malpractice trial to relitigate factual contentions that have already been

---

the hearing before this Court that are in tension with representations previously made to Chief Judge Carr.

[8] This Court does not intend to be critical of the expedited process employed by Judge Corrigan. Cuyahoga County Judges must contend with almost breathtakingly large dockets, which they ably manage with only the aid of a relatively small staff.  Were Judge Corrigan expected to produce lengthy written analysis in response to every motion *in limine*, his court would essentially come to a halt.

litigated in Federal Court and have already been determined in the matter adverse to the plaintiff.

(*Id.*  Objection of Attorney Petrov.)

Shortly after receiving Judge Corrigan's ruling, Friedman and Moore (collectively, the "Movants") filed Motions seeking to enjoin Thomas from pursuing his state court claims in their entirety. (Friedman's Br. of January 21, 2009 (Doc. 39); Moore's Br. of January 22, 2009 (Doc. 41).)

## II.  LEGAL STANDARD

Federal Courts generally are barred from enjoining state proceedings by the Anti-Injunction Act. *See* 28 U.S.C. § 2283. Congress passed the Act to reinforce "the fundamental constitutional independence of the States and their courts." *Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive En'rs*, 398 U.S. 281, 287 (1970).

The Anti-Injunction Act does, however, contain an exception to allow federal courts to protect the effect of their judgments: a district court may issue an injunction to prevent state court proceedings from moving forward when those proceedings would religitate an issue that has already been decided by the district court.  *See Huguley v. General Motors Corp.*, 999 F.2d 142, 145 (6th Cir. 1993).  This "relitigation exception" allows a district court to issue an injunction "to protect or effectuate its judgments."  *Id.*  (citing 28 U.S.C. § 2283).

The Supreme Court has stated that "an essential pre-requisite for applying the relitigation exception is that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147 (1988).  Consistent with this principle, a district court may only consider what its earlier "order actually said;" it may not "render a post hoc judgment as to what [its] order was intended to say."  *Id.*; *but see St. Paul Mercury Ins. v Williamson*, 224 F.3d 425, 448 (5th Cir. 2000) ("In determining which issues

6

have been actually litigated, the federal court is free to go beyond the judgment and may examine the pleadings and the evidence in the prior action.").

Under the relitigation exception, a federal district court may, but need not, issue an injunction to halt state court proceedings in cases where principles of collateral estoppel would prevent litigation of issues before the state court were those issues raised in federal court. *See, e.g.*, *Ballenger v. Mobil Oil Corp.*, 138 Fed. Appx. 615, 619 (5th Cir. 2005) ("[T]he relitigation exception applies if a judgment of the federal court precludes the . . . issues (collateral estoppel) raised in the state litigation."); *Huguley*, 999 F.2d at 145 (6th Cir. 1993) ("The relitigation exception is grounded in principles of . . . collateral estoppel.") (citing *Chick Kam Choo*, 486 U.S. at 147).[9] Collateral estoppel "precludes the relitigation of an issue that has been actually and necessarily litigated and determined in a prior action." *McKinley v. City of Mansfield*, 404 F.3d 418, 428 (6th Cir. 2005).[10]

---

[9] Although it is generally true that, to obtain a permanent injunction, a movant must show "a clear threat of continuing illegality portending immediate harmful consequences irreparable in any other manner," no such showing is necessary under the relitigation exception to the Anti-Injunction Act. *Liberty Mut. Ins. Co. v. Gunderson*, No. 04-2405, 2007 U.S. Dist. LEXIS 89479, at *12 (W.D. La. Nov. 30, 2007), *aff'd*, 2008 U.S. App. LEXIS 25502 (5th Cir. Nov. 25, 2008) (citing *Posada v. Lamb County*, 716 F.2d 1066, 1070 (5th Cir. 1983)). Rather, "demonstrating that the matter satisfies the prerequisites of the relitigation exception is sufficient to demonstrate both the harm of continuing the state litigation and the lack of an adequate remedy at law." *Id.* (citing *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 667 (5th Cir. 2003)) (other citations omitted). In accord with this principle, Thomas challenges only the applicability of the relitigation exception and implicitly concedes that the Movants would suffer irreparable harm absent the injunctive relief.

[10] While the Court presumes that the federal law of collateral estoppel applies when a court analyzes the applicability of the relitigation exception, there is no need to conclusively resolve this question today. The Ohio doctrine of collateral estoppel is not inconsistent with federal law. *See Humphreys v. Tann*, 487 F.2d 666, 668 (6th Cir. 1973); *Tucker v. Potter*, No. 03-2359, 2009 U.S. Dist. LEXIS 61060, at *43 n.14 (N.D. Ohio July 6, 2009) ("[T]he courts of Ohio generally apply collateral estoppel in a manner consistent with the Supreme Court's view of the doctrine"); *compare also Dye v. City of Warren*, 367 F. Supp. 2d 1175, 1184 (N.D. Ohio 2005) (setting forth the elements of collateral estoppel under Ohio law) *with Cobbins v. Tenn. Dep't of Transp.*, No. 07-6491, 2009 U.S. App. LEXIS 8365, at *18 (6th Cir. Apr. 2, 2009) (citing *N.A.A.C.P., Detroit Branch v. Detroit Police Officers Ass'n*, 821 F.2d 328, 330 (6th Cir. 1987)) (setting forth the elements of collateral estoppel under federal law).

7

To successfully invoke the religitation exception on the grounds of collateral estoppel, a party must show: (1) that an issue was raised and actually litigated in the prior proceeding; (2) determination of this issue was necessary to the outcome of that proceeding; (3) the prior proceeding resulted in a final judgment on the merits; and (4) the party against whom collateral estoppel is being asserted had a full and fair opportunity to litigate the relevant issue. *Bies v. Bagley*, 535 F.3d 520, 524 (6th Cir. 2008). Both parties need not be the same for collateral estoppel to apply. *See, e.g.*, *Hancock v. Ohio*, No. 98-3297, 1999 U.S. App. LEXIS 29715, at *4 (6th Cir. Nov. 5, 1999) ("[Plaintiff's] claims are barred by the doctrine of collateral estoppel, even if there is not complete identity of the parties.").

### III. THE APPLICABILITY OF COLLATERAL ESTOPPEL

In its November 30, 2006 Order, this Court conclusively determined that Thomas:

(1) Knowingly authorized a settlement with Thistledown for $7,500 and an agreement by Thistledown that it would not retaliate against Thomas. (Order of November 30, 2006 at 5-7 ("Plaintiff next claims that his attorney did not have the authority to dismiss or settle the case. . . . [Yet, Thomas] told Judge Manos that he would accept, albeit grudgingly, $7,500 as settlement for his claims. . . . [T]he Court cannot credit [Thomas'] claims regarding the amount of the settlement. . . . The Court has determined that this is a case of buyer's remorse."); (Hrg. Tr. of October 27, 2006 at 17:8-15 (statement of the Court) ("I can tell you in this case that Judge Manos' law clerk both has notes and a very clear recollection that your client told Judge Manos that he would take $7500, that he said he wasn't thrilled about it but he would take it, he would accept it, and he would agree to that settlement. So there may have been discussion about him wanting more, but buyer's remorse is not a basis to set aside a judgment."); *cf.* Hrg. Tr. of February 4, 2009 at 43:11-15 (statement of the Court) ("[Thomas] may not have liked it after the fact or there may have been some things said after the fact that made him even more upset, but I made the determination that he knowingly said 'I will take $7,500.' I mean, that's done.")).[11]

---

[11] The primary thrust of Plaintiff's 60(b) motion was the factual assertion that he had not agreed to or authorized the settlement and dismissal of his claims against Thistledown for $7,500 and a non-retaliation agreement. (Thomas' Br. of June 22, 2006 at 2 ("[Friedman and Moore] tried to force [Thomas] to accept a settlement agreement in the amount of $15,000.00. . . . However, when Plaintiff saw the proposed settlement agreement, it was only for $7,500.00.").) As accurately framed by Moore:

The purpose of the evidentiary hearing was to test the validity of the assertion. The hearing was devoted to the issue. For the Plaintiff now to claim that the 60(b)

(2) Personally informed Judge Manos that he would agree to settle his claims on those terms.  (Order of November 30, 2006 at 5-6 ("[Thomas] told Judge Manos that he would accept, albeit grudgingly, $7,500 as settlement for his claims.")).

(3) Knew that Thistledown would not take employment taxes out of the $7500.  (*Id*. at 6 n.6 ("[Thomas] has a very clear recollection . . . that [Thistledown was] not to withhold taxes from the payment to him.")).

(4) Understood that the settlement was compensation for his allegations of hedonic damages.  (*Id*. at 9 n.7 ("The Court has found that the parties agreed that the settlement amount would represent payments for hedonic damages.")).

(5) Understood that these promises by Thistledown were in return for an agreement by plaintiff to dismiss his then-pending claims and not refile them.  (*Id*. at 7 ("[Thomas] could offer no explanation for why he felt the Defendants would pay him any sum without requiring him to dismiss his claims against them, or what a "settlement" would mean in the absence of a dismissal.  It should be obvious to anyone that a settlement would require some sort of consideration or performance on the part of the Plaintiff – i.e. a dismissal of his claims with prejudice.  After examining the record, interviewing court personnel present during the settlement, and considering the testimony provided during the hearing, the Court cannot credit Thomas' claims regarding . . . the dismissal with prejudice."); (Hrg. Tr. of October 27, 2006 at 19:16-

---

proceedings in no way decided whether Mr. Thomas knowingly settled for $7,500 is preposterous.

(Moore's Br. of March 19, 2009 at 4.)  Indeed, this Court <u>began</u> its hearing by establishing the primacy of this issue:

COURT: First, I want to make sure I understand, you are contending that the plaintiff did not know that the settlement was going to be for $7500?

MS. GROEDEL: That's correct, Your Honor.

COURT: And what do you base that on?

MS. GROEDEL: We base that on my client and his siblings, who were in Court on that day, and all were told that it was $15,000. . . .

(Hrg. Tr. of October 27, 2006 at 3:20-4:2; *cf.* Hrg. Tr. of February 4, 2009 at 40:17-19, 41:6-8, 41:17-25 (statement of the Court) ("[T]here is no confusion about what I found.  I found that he agreed to the settlement; that he specifically knew it was a $7,500 settlement, and he agreed to that. . . . I specifically found that there was no mention of the $15,000 during the settlement conference, and your client said there wasn't. . . . I remember exactly what those witnesses said, and I have reread what those witnesses said, but what I specifically found was that he entered into a $7500 settlement.  Put aside whether you think he was advised enough before he did that.  I specifically found he entered into a $7,500 settlement, and the fact that afterward it may have been puffed up to look a little better than what it was doesn't change what he knowingly entered into.")).

19 (statement of the Court) ("[T]here is not a reasonable person in the world that would not – that would believe that they could get money out of a lawsuit and not have to walk away from the lawsuit.")).

Consistent with these findings and essential to the judgment, this Court also found that:

    (1) Acting as Thomas' agent, Friedman made a conscious decision to stipulate to the filing of a judgment entry reflecting that the case was to be designated as settled and dismissed with prejudice.  (Order of November 30, 2006 at 5 ("[Friedman] concedes he read [the settlement], understood it, and approved it.")).

    (2) The response to Thistledown's Motion for Summary Judgment was not yet due as of the date of the settlement conference (*Id.* at 9 ("[Thomas' deadline to file a response had not yet passed [as of the settlement conference].")).

    (3) The settlement mooted the need to file any response to Thistledown's prior motion for Summary Judgment (*Id.* ("[Thomas' attorneys [Friedman and Moore] did *not* fail to respond to the summary judgment motion; the need for a response was mooted by the settlement." (emphasis in original))).

Notably, Thomas did <u>not</u> appeal any aspect of this Court's November 30, 2006 order or the findings therein.

Thomas is currently attempting to relitigate several of these factual conclusions before Judge Corrigan.  Thomas's complaint in that action relies in part on the issue at the heart of the November 30, 2006 Order, which concluded that Thomas knowingly entered into a settlement in the above captioned action.  His state court complaint puts at issue "<u>whether there's a settlement or not</u>. . . . [and] [t]he facts surrounding any discussion regarding whether or not the case was concluded or [whether] a settlement [was reached or] what was understood by [Thomas] . . . is the issue in the case."  (No. 07-636137 1/20/09 Hrg.) (emphasis added); *see also* No. 07-636137 Compl. at ¶ 11) ("Plaintiff sustained injury, loss, and damages in excess of $200,000 . . . other than the nuisance value settlement which Defendants accepted <u>without Plaintiff's express knowledge</u> and understanding.") (emphasis added)).  Thomas, however, has persuaded the state court that collateral estoppel does not prevent reconsideration of <u>any</u> of the issues considered by this Court during its November 30, 2006 hearing.  (*Id.* ("I don't think collateral estoppel is

applicable in this case," while the federal court may have considered the some of the same facts as this case, I have excluded its "conclusion about those facts.")).

This Court has great respect for principles of federalism.  Its concern with extending proper comity to state courts generally is heightened here, moreover, because Judge Corrigan has already extended this Court substantial consideration (*see generally* Court Order of January 23, 2009 (Doc. 44)). Nevertheless, Thomas is attempting to escape the consequences of his choice to litigate before this Court, and it is appropriate for this Court to protect the effect of its prior judgment.

Judge Corrigan's conclusion that the November 30, 2006 Order had no preclusive effect was understandable in light of the apparent confusion by *all* parties in that forum concerning the critical differences between collateral estoppel and res judicata.  Thomas, for example, persisted in arguing that collateral estoppel should not apply because Friedman and Moore were not parties before this Court during the 60(b) proceedings.  That consideration, while meaningful with respect to res judicata, is simply not controlling for collateral estoppel purposes.  Similarly, Friedman and Moore asked the state court to bar consideration of issues that <u>could</u> have been litigated during the 60(b) proceedings, a request that would only have been appropriate under res judicata.  As explained below, this confusion by the parties lead Judge Corrigan to issue a ruling that was only partially correct.

**A.  Collateral Estoppel Applies to Issues That Were "Actually Litigated"**

The doctrine of collateral estoppel only applies to issues that were "actually litigated."  The November 30, 2006 Order can only have a preclusive effect, if at all, as to issues that were actually considered and resolved by the Court.

**1.  Thomas' Contention that the Above Eight Issues Were Not "Actually Litigated" is Without Merit**

As discussed above, the Court resolved eight separate issues against Thomas.  The parties framed these issues somewhat differently before Judge Corrigan and have briefed this Court in a manner

11

consistent with that framing.  During initial briefing on this matter, Thomas appeared to concede that the Court actually addressed these eight issues in its November 30, 2006 Order.  (*See* Thomas Br. of January 22, 2009 at 3-4 (challenging the preclusive effect of the above issues primarily on the grounds that the record was not fully developed).)  In his motion for reconsideration, however, Thomas asserts, for the first time, that three of the above issues were not determined in the Court's 2006 Order:

> No where [sic] in the November 30, 2006 Order did this Honorable Court make a finding of fact or issue a judgment as to whether [Thomas] "knowingly authorized" the settlement, or whether [Thomas] had an "understand[ing]" as to "hedonic damages," or an "understand[ing]" that "the promises by Thistledown were in return for an agreement by plaintiff to dismiss his then-pending claims with prejudice." . . .

> [B]arring [Thomas] from raising in his malpractice case whether he "knowingly" authorized a settlement; "understood" the settlement; and "understood" that he would have to dismiss his claims, will cause a manifest injustice to [Thomas] during the trial of his state malpractice case, because directly at issue in the malpractice case is whether [Thomas] was informed of relevant considerations during Friedman and Moore's representation of him, including, but not limited to, the settlement negotiations.

(Thomas Br. of February 27, 2009 at 5-6.)  Thomas, however, is mistaken.

At base, Thomas' 60(b) motion asserted that Thomas had not agreed to or authorized the settlement and dismissal of his claims against Thistledown for $7,500 and a non-retaliation agreement.  (*See* Thomas' Br. of June 22, 2006 at 2 ("[W]hen [Thomas] saw the proposed settlement agreement, it was only for $7,500.00 and did not contain [certain] promised provisions; therefore, [Thomas] refused to sign.  [Thomas] had every indication that his case would continue forward, but instead found out that <u>his case has been dismissed with prejudice without his knowledge or consent</u>." (emphasis added))).  In its 2006 Order, the Court determined to the contrary, in large measure based on Thomas' <u>own</u> testimony, some of which contained candid admissions inconsistent with his current counsel's arguments, and some of which this Court found not credible when taken in the context of the remainder of his testimony.  (Court Order of November 30, 2006 at 7 ("[T]he Court cannot credit [Thomas'] claims regarding the amount of the settlement or the dismissal with prejudice. . . . The Court has determined that this is a case

12

of buyer's remorse.")).[12]   In other words, if Thomas had not "knowingly authorized" Friedman and Moore to settle, if he had not "understood" that he was agreeing to a settlement for $7500, <u>or</u> if he had not understood that the settlement was for "hedonic damages," the Court could not have approved of that settlement in light of the way in which Thomas framed the issues in his 60(b) motion.[13]   It is clear, then, that the issues described above were "actually litigated" in 2006.[14]

### 2. The Court Did Not Reach Additional Conclusions During the 60(b) Hearing

Movants, for their part, assert that this Court reached additional conclusions when it considered Thomas' initial motion.  Most pointedly, they argue that this Court held that Friedman and Moore did not neglect Thomas and argue that the absence of any such neglect is the equivalent of the absence of

---

[12] Thomas misconstrues the import of the Court's observation in its 2006 Order, that "[w]hile [Thomas] may have misunderstood the operation of a dismissal with prejudice, it is absurd to think that [Friedman or Moore] did."  (Order of November 30, 2006 at 4-5.)  This sentence of the Order references the assertion that Friedman and Moore had made a mistake in entering into the settlement agreement and <u>prior to the Court's consideration of what Thomas himself had known</u>.  In the section of the opinion dealing with what Thomas himself knew, however, the Court ultimately concluded that Thomas did realize that he was entering into a settlement agreement for $7500.  (*Id.* at 7 ("The Court has determined that this is a case of buyer's remorse.").)

[13] Thomas' assertion that he could not have "understood" that the $7500 settlement was for "hedonic damages" because Thomas has not necessarily even heard of the term "hedonic damages" in 2006 is unavailing.  (*See* Thomas Br. of February 27, 2009 at 6.)  The 2006 Order found that Thomas understood that his damages were for pain and suffering – its use of the technical term "hedonic" does not make that finding any less binding.  (Court Order of November 30, 2006 at 9 n.7 ("The Court has found that the parties agreed that the settlement amount would represent payments for hedonic damages."); *see also* Hrg. Tr. of October 27, 2006 at 23:14 ("[Judge Manos] also said I could get the pain and suffering."); Moore Br. of March 13, 2009 at 9-10 (summarizing the interchangeable use of the technical term hedonic with equivalent terms during the 60(b) hearing)).

[14] The Court notes that this is by no means fatal to Thomas' malpractice allegations.  Knowing that one is settling a case for $7500 and being properly informed as to the wisdom of accepting such a settlement are different things.  So, too, many unusual aspects of Friedman and Moore's representation of Thomas, such as Friedman and Moore's apparent acceptance of fees in excess of the potential value of the lawsuit itself, have not been raised in this forum.  Thomas, indeed, appears to assert numerous allegations in the state malpractice case that, if true, raise concerns about the conduct of Friedman and/or Moore.  The Court expresses no opinion on those issues, indeed, the Court is without proper evidence with which it could form such an opinion, but notes this to further clarify the distinction between this Order and the issues raised by the state malpractice trial.

malpractice.   Premised on this argument, Friedman and Moore then assert that <u>no</u> state civil action premised on assertions of malpractice could proceed without undermining the integrity of this Court's judgment.  Movants, like Thomas, misunderstand what the court actually considered in the context of the Rule 60(b) motion before it.  This Court has never been asked to consider whether Thomas' original attorneys may have committed legal malpractice, or even were negligent in a common law sense.  What the Court considered was whether Friedman and Moore's conduct could be characterized as such a complete abandonment of their client that the Court should find any resulting settlement sufficiently unjust to justify an order setting it aside.  This Court applied the federal 60(b) standard in its analysis – the Court did not express then, and certainly does not express now, any opinion as to whether Friedman and Moore may have been negligent under state malpractice law.  It is possible, for example, that a state court may find that Friedman and Moore should have developed Thomas' case more fully before participating in the settlement conference, or should have told Thomas more before he agreed to the settlement.  This Court was not asked to consider such issues and, accordingly, did not reach them.

One additional issue bears special mention.  Before the state court, Thomas now argues that he only entered into the settlement agreement with Thistledown under duress from his then-counsel.  Whether this issue was "actually litigated" is something of a close call.  This Court explicitly concluded that Thomas gave his attorneys authority to settle his case and used language in its opinion (e.g., "buyer's remorse") that clearly indicates that it did not consider Thomas to be acting under duress.  His counsel before Judge Corrigan is the same as counsel in the fall of 2006 and that counsel had ample time to prepare him for the Rule 60(b) hearing.  It is certainly peculiar for Thomas not to have explicitly raised the issue of duress when bringing his 60(b) motion, as duress is a very persuasive ground upon which a court may choose to reopen a judgment.  The Court concludes, however, that the issue of duress was not squarely considered in 2006 and that the question of what was "actually litigated," must be construed

extremely narrowly for purposes of collateral estoppel.  For that reason, the Court does not believe it has the power to bar consideration of this issue.[15]

Movants further assert that all of the issues being litigated before Judge Corrigan <u>could</u> have been raised before this Court.  Moore and Friedman do not prevail on this point – as previously noted, collateral estoppel applies only to issues that actually *were* litigated, not to issues that could have been litigated.[16]

### 3.  Thomas Misunderstands the Court's Prior Ruling

Thomas' response to the Movants' contention that this Court should bar consideration of issues that could have been litigated requires some discussion.  Groedel selectively quoted from this Court's prior hearing, in order to argue that the Court cannot preclude consideration of any of the issues raised by the malpractice suit because this Court actually instructed Thomas to file it.  The Court did no such thing: in context, the passage relied upon revealed the Court's frustration with Groedel's groundless ethical attacks on Moore, not a comment designed to encourage state court litigation.  As noted, Groedel asserted that <u>only</u> contingency fee attorneys could be trusted to zealously advocate for their clients and, indeed, implied that this was true because <u>only</u> contingency fee attorneys had a financial stake in the outcome of

---

[15] It does seem that this is something of a pyrrhic victory for Thomas.  Friedman and Moore can surely argue in state court that Thomas' failure to raise duress in 2006 indicates that Thomas was never actually under duress.

[16] This Court is, for example, without power to bar the argument now made by Thomas, extensively discussed at the February 3, 2009 hearing, that Friedman and Moore should never have filed a civil rights lawsuit in federal court and should have instead filed in state court.  While this Court is stunned by the argument that federal courts are inadequate guardians of the civil rights of the citizens within its jurisdiction (indeed, Thomas' current counsel, Groedel, has prevailed in civil rights matters before this Court), or the argument that the mere choice to file a civil rights action in federal court could be deemed malpractice (or even indicative of malpractice) under state law, whether such an argument is admissible under Ohio law should be addressed by the Ohio courts.

the case.[17]  The Court informed Groedel that, if she wished to argue that the representation of a plaintiff on an hourly rate basis was <u>per</u> <u>se</u> unethical she needed to raise that issue in a "different context."  The Court was clearly referring to grievance procedures, not a state court malpractice action.  Indeed, Groedel pursued two unsuccessful grievances shortly after the proceedings before this Court, supporting the conclusion that she understood at the time what this Court meant.

### B.  To be Barred from Reconsideration by the State Courts, an Issue Must Have Been "Necessary to the Outcome" of the 2006 Proceeding

Even when the Court has considered an issue, collateral estoppel does not apply if a given issue was not "necessary to the outcome" of the original proceeding.  Neither party has ever contested this prong of the collateral estoppel analysis and it seems clear that each of the eight issues "actually litigated" before this Court were also necessary to its ultimate holding.

### C.  An Issue is Only Barred from Reconsideration if the Court Issued a Final Judgment on the Merits

Thomas asserts that a Rule 60(b) motion should not be given preclusive effect under the doctrine of collateral estoppel because it is not a final judgment.  Thomas is simply incorrect – it is well-settled that"[t]he denial of a Rule 60(b) motion is a final judgment."  *Kersh v. Am. Heart of Mich., Inc.*, 76 Fed. Appx. 648, 649 (6th Cir. 2003) (citing *Good v. Ohio Edison Co.*, 149 F.3d 413, 417 (6th Cir. 1998)) (additional citations omitted).

---

[17] The Court again notes its amazement with this argument, which would engender the utmost disrespect for all lawyers if true.  Indeed, if one accepted this contention, all contingency fee lawyers would be subject to sanction, because lawyers must guard against decisions made because of a "personal" financial interest in a client's litigation.  The Court presumes that Thomas is making an entirely different argument before Judge Corrigan, namely that a contingency fee may sometimes be more appropriate than a fixed hourly rate, depending on the plaintiff's financial status and the strength of that plaintiff's claims.  Groedel conceded that she has refined her argument in this way during the February 2, 2009 hearing on the instant motion and the Court accepts that representation as true.

Thomas' persistent argument here that the district court's disposition of a Rule 60(b) motion is not precisely the same as a legal malpractice action is largely irrelevant. A legal malpractice claim is indeed different from a Rule 60(b) motion, but factual issues, such as whether an attorney failed to respond to a summary judgment motion, can be common to both. Thomas' motion pursuant to Rule 60(b) directly put in issue many of the factual allegations now underpinning the state malpractice claim. Thomas' argument that a Rule 60(b) motion and an action in state court for legal malpractice are not identical vehicles generally raises "a distinction without a difference for purposes of collateral estoppel." *Evans v. Pearson Enterprises, Inc.*, 434 F.3d 839, 850 (6th Cir. 2006).[18]

### D. An Issue is Only Barred from Reconsideration if the Party Against Whom Collateral Estoppel is Asserted had a "Full and Fair" Opportunity for Litigation

Thomas devotes a considerable portion of his briefing to arguing that the proceedings before this Court did not afford him a full and fair opportunity for litigation. (*See generally* Thomas' Br. of January 26, 2009.) Thomas' arguments here are disingenuous. He notes that this Court's November 30, 2006 findings were based on "the record" of those proceedings, and that that record is different from the record that would be developed in a full-blown state court legal malpractice action. But Thomas chose this Court as his forum, Rule 60(b) as his vehicle, and what evidence to present. Thomas called witnesses to testify at the hearing. Of particular relevance, Friedman and Moore were both present in the courtroom and could have been called to testify, but Thomas chose not to call them. Fundamentally, Thomas himself deliberately created the very record he now seeks to attack. That he believes he could have presented a stronger case then, or that he believes he has evidence supporting a stronger case now, is of no moment. For Thomas to note repeatedly that the record before Judge Corrigan is more developed than

---

[18] That difference is only meaningful at the margins – i.e., with respect to the scope of the factual conclusions that were made. For instance, the finding that Moore and Friedman did not "abandon" Thomas under the relevant Rule 60(b) standard is not determinative of the question of whether they may have been "negligent" in their handling of Thomas' case.

the record that was presented to this Court is exactly wrong: collateral estoppel exists in part to discourage this very behavior – parties may not relitigate unfavorable findings merely because they believe they can present a stronger case the second time around.[19]

Thomas also argues that he was not afforded a full opportunity to cross-examine witnesses. This is highly misleading. This Court did not rely on <u>any</u> of the Defendants' case-in-chief. Instead, it held that Thomas, having been afforded the opportunity to present his case, failed to carry his burden. (*See generally* Order of November 30, 2006).[20]  Indeed, as noted above, the Court relied heavily on Thomas' own testimony, including his pointed failure to deny that he told Judge Manos he would accept a settlement of $7500 and his admission that no dollar figure other than $7500 was raised during his discussions with Judge Manos. Even if the Court had considered Defendants' case-in-chief, Thomas still could not prevail, moreover, because he at no prior point challenged the fairness of this Court's hearing. *See Bies*, 519 F.3d at 339 ("[Respondent] did not claim at any point during those proceedings that they were somehow unfair, or otherwise denied them a full and fair chance to present their arguments."). Thomas did not ask this Court to reopen the record before it by pointing to anything meaningful he would have proffered, and did not appeal this Court's judgment on that, or any, ground.

---

[19] Furthermore, the Court notes that almost none of the additional evidence raised by Thomas concerns the issues actually litigated before this Court – rather, it concerns issues that could have been raised, but were not. As previously explained, Thomas generally is not prevented from raising such arguments against Moore and Friedman in state court.

[20] Although not necessary to this decision, it is also true that a party can have a "full and fair" hearing without a complete cross-examination.  *See Chauffeur's Training Sch., Inc. v. Spellings*, 478 F.3d 117, 132 (2d Cir. 2007) ("A requirement of collateral estoppel is that there must have been full and fair opportunity for the litigation of the issues in the prior proceeding. . . . In these circumstances the unavailability of cross-examination was not significant."); *Duane v. United States DOD*, 275 F.3d 988, 996 (10th Cir. 2002) ("[A]dditional witnesses . . . would not have changed [the] facts [necessary to judgment], nor would . . . additional cross-examination.").

### IV. WHETHER AN INJUNCTION SHOULD ISSUE

Although this Court has concluded that the doctrine of collateral estoppel would ordinarily operate to bar Thomas from raising many of the issues he is currently attempting to raise in state court, this Court still must consider whether to issue an injunction in this case under the relitigation exception. The Court concludes that the relitigation exception was intended in part to allow a district court to protect its judgments on precisely the instant facts: litigants should not be permitted a second bite at the apple in state court merely because they have managed to persuade a state court with misleading briefing.  It is, in fact, this Court's hope that appropriate use of the relitigation exception to the Anti-Injunction Act will discourage litigants from such behavior in the first instance.

Indeed, the exception applies with particular force in the instant case, as the Court concludes that more factually and legally accurate briefing before Judge Corrigan may well have forestalled the need for such extraordinary relief in this forum.  The Court concludes that the injunction sought herein properly falls within the exception for injunctions "necessary to protect or effectuate [the district court's] judgments," 28 U.S.C. § 2283; *see also Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 894 (6th Cir. 2002).  The relitigation exception exists to give effect to orders regarding claims or issues that have been decided by the federal court and to protect them from being ignored, undermined, or relitigated in state proceedings, *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 148 (1988).  So, too, the Court considers Thomas' argument that preventing relitigation of these issues would be a "manifest injustice" and concludes that the argument is unfounded – because Thomas was offered a full and fair opportunity to litigate these issues two years ago, and because the record clearly establishes that Thomas expressly agreed to the settlement about which he complains, it is not unjust to prevent him from rearguing those same issues today.

## V. THIS COURT'S ORDER WAS NOT AN "ATTACK" ON THOMAS' CURRENT COUNSEL

Thomas argues that the Court Order of February 20, 2009 "is largely an *ad hominem* attack on attorney Caryn M. Groedel." (Thomas Br. of February 27, 2009 at 7.)[21]  Thomas asserts, as well, that the Court has "venom towards [Groedel]. . . ." and that the Court is "inexplicabl[y] yet blatantly hostile [towards Groedel]. . . ." (*Id*. at 10-11.)  He asserts that this Order contains "attacks" that:

    (a) have nothing to do with the outcome of the matter before the Court;
    (b) frequently relate and refer to events that transpired more than two (2) years ago;
    (c) misquote attorney Groedel;
    (d) are unfair;
    (e) are injudicious;
    (f) are unprofessional; and
    (g) are entirely inaccurate.

(*Id*. at 7.)  These contentions are surprising and erroneous.  The Court has no hostility towards Groedel as an individual – her clients have prevailed in this Court in the past and there is no particular reason to expect that her clients will not enjoy considerable success in the future.  Indeed, this Court has commented positively regarding Groedel's court performances when asked to do so, such as in response to unsolicited inquires from legal publications or organizations.  Nevertheless, attorneys "who make arguments to courts . . . must be prepared to receive the Court's candid analysis in return and must appreciate that such analysis will not always be favorable." (Moore's Br. of March 13, 2009 at 10-11).  The Court does have concerns with Groedel's professional conduct in this particular action and those concerns are reflected in this Order.

---

[21] Because the Court has almost entirely restated the February 20, 2009 Order here, the Court will not quote directly from that Order, but will instead refer to it.  The same relevant language, however, is contained in both orders.

### 1.  The Court's References to Prior Arguments are Appropriate

Groedel has made a number of arguments during the course of this litigation that the Court considers frivolous or inappropriate, and an understanding of those arguments is essential to an understanding of this case.  Of particular importance, it is not possible to understand why the Court concluded its 60(b) hearing without reference to these arguments.[22]  To that end, Thomas' concern that the Court's references to Groedel "have nothing to do with the outcome of the matter before the Court . . . [and] frequently relate and refer to events that transpired more than two (2) years ago" is inaccurate.  The very purpose of this Order is to determine the effect of a ruling issued "more than two (2) years ago."  This Order, then, primarily concerns the events that transpired at that time.

### 2.  Thomas Was Afforded a Full and Fair Opportunity for Litigation, and the Court's Discussion on that Topic is not an Attack on Thomas' Current Counsel

Thomas asserts that the Court's discussion of his "full and fair opportunity" for litigation is an inappropriate attack on his current counsel:

> [T]his Court devoted a page and a half to [Groedel's] argument that the proceeding before the Court did not afford him a full and fair opportunity for litigation, which this Court found "disingenuous." (Order pages 13-14.)  However, Thomas was at the 60(B) [sic.] hearing for one purpose and one purpose only: to appeal to the Court to set aside a Judgment Entry based on one or more of the factors listed in Federal Rule of Civil Procedures 60(B).  Plaintiff did not bring the 60(B) Motion to litigate the issue of malpractice, to litigate the issue of the propriety of an hourly fee agreement versus a contingent fee agreement in employment cases where the Plaintiff earns $8.54 per hour, to challenge the amount of hours, or lack of hours, that his previous attorneys expended or failed to expend in their representation of him, or any other matter whatsoever.  His failure to develop the record, as criticized by this Court on page 13 of February 20, 2009 Order, was appropriate. . . .

(*Id*. at 12.)  Thomas's contentions here are somewhat confusing.  First, Thomas does not ask this Court to reconsider its February 20, 2009 finding that he was afforded a full and fair opportunity for litigation,

---

[22] Nor, as well, is it possible to understand why Judge Corrigan mistakenly ruled that collateral estoppel did not apply to this case without an understanding of the inaccurate arguments that were made by counsel in that action.

despite asserting that the Court's finding was in some way unfair to his current counsel.[23]  Second, the above does not explain to the Court what Thomas perceives to be an unfair "attack," rather, it appears to be a disagreement with the Court's conclusion.  Finally, the Court continues to find the argument articulated by Thomas unavailing for three reasons: (1) that his 60(b) motion was not brought for the purpose of litigating malpractice in no way lessoned Thomas' motivation to fully develop the record with respect to the issues essential to the 60(b) motion; (2) the specific issues described by Thomas above were not determined at the 60(b) hearing and; (3) far from criticizing Thomas for not fully developing the record with respect to issues such as the propriety of an hourly fee agreement, the Court questioned Thomas' counsel about the need to raise such issues at all.

### 3.  The Court Accurately Summarized Groedel's Arguments

Thomas complains that the Court's description of Groedel's arguments are inaccurate.  He argues:

[T]he Court states . . . that: "Groedel made certain inappropriate ethical allegations towards one of the Defendants' witnesses, Moore.  Specifically, Groedel argued that only contingency fee lawyers could be trusted to zealously represent their clients because contingency fee lawyers had a financial stake in the outcome of the case."

However, the transcript of the 60(B) reflects nothing of the sort.  Rather, Plaintiffs counsel inquired of Sarah Moore as follows:

> [MS. GROEDEL:] But as a concept, wouldn't it be fair to say that Plaintiffs' attorneys who work on a contingency have a greater incentive than those working on an hourly to get more money for their clients?
>
> [MS. MOORE:] I would not.
>
> [MS. GROEDEL:] It didn't matter to you how much the case settled for, because you had no proprietary interest. Calvin already had paid you thousands and thousands of dollars, right?

---

[23] Note that, because the Court substitutes this Order for its February 20, 2009 Order, the Court's analysis of the "full and fair opportunity" issue is restated in full above.  The fact remains, however, that Thomas did not ask the Court to reconsider its initial conclusion.

[MS. MOORE:] It did matter to me, because I have an ethical obligation to zealously represent my client.

[. . .]

> THE COURT: Ms. Groedel, are you implying that contingency attorneys base their efforts in a case on what they can put in their own pocket, in violation of all of the applicable ethical rules?
>
> MS. GROEDEL: Your Honor, I am saying that **my client believes** that Mr. Friedman sold him short because he had already been paid – **because he had already paid over $20,000.00** –
>
> THE COURT:  So your client believes that all lawyers are unethical, and you are feeding on that by implying that contingency lawyers somehow have a greater interest in the results?
>
> MS. GROEDEL: No greater interest, but I do -- but **Mr. Thomas does believe that he was sold short by these attorneys** in trying to get him to settle for $5,000.00 **when they had already been paid in excess of $20,000.00**.

1. Nowhere did Plaintiff's counsel state that "contingency attorneys" base their efforts on what they can put into their own pocket. Plaintiff's counsel spoke only as to her client's opinion.

2. Plaintiff's counsel was speaking of her client's opinion with respect to two attorneys only –not "all lawyers."

3. Nowhere did Plaintiff's counsel state, or even infer, that "only contingency fee lawyers could be trusted to zealously represent their clients."
. . .
The Court appeared to be making great efforts to impugn Plaintiffs counsel's reputation and representation of Calvin Thomas . . . by unabashedly and without cause laying into Plaintiff s counsel, "and if you believe that only when you are on contingency do you work hard for your client, then I have some real concerns about the kinds of lawyering that you are going to do," although there is no evidence in the record as to what Plaintiffs counsel believed but only as to what her client believed.

(Thomas' Br. of February 27, 2009 at 8-9) (emphasis in original) (internal citations omitted).  These

allegations are not well-founded.

As an initial matter, an attorney may not defend an otherwise inappropriate argument by asserting that she was only representing her client's opinion, because it is well-settled that "[a] lawyer who pursues frivolous litigation cannot defend himself by arguing that his client made him do so."  *Midlock v. Apple Vacations West, Inc.*, 406 F.3d 453 (7th Cir. 2005) (Posner, J.); *see also Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1337 (11th Cir. 2002) ("An attorney does not serve as a mere mouthpiece or alter ego for his client, obligated to urge any motion or argument that his client wishes him to file."); *cf. Sahyers v. Prugh, Holliday & Karatinos, P.L.*, 560 F.3d 1241, 1246 (11th Cir. 2009) ("[A] lawyer's duties as a member of the bar – an officer of the court – are generally greater than a lawyer's duties to the client.").  The attorney controls the arguments advanced, not the client. OHIO RULES OF PROFESSIONAL CONDUCT 1.2 CMT 2 ("[A client] normally defer[s] to the special knowledge and skill of their lawyer with respect to the means to be used to accomplish their objectives, particularly with respect to technical, legal, and tactical matters.").  Every lawyer must exercise his or her own independent professional judgment in advancing arguments before the tribunal: lawyers are not merely voices giving expression to their clients opinions.  *Welch v. Artus*, No. 04-CV-0205S, 2007 U.S. Dist. LEXIS 97795, *49 (W.D.N.Y. Jan. 23, 2007) ("A lawyer has an obligation to apply his or her independent professional judgment in deciding which arguments to make; counsel need not and should not simply make the arguments a client wishes to make, thereby reducing his or her role to that of a mere mouthpiece for the client." (citing *Jones v. Barnes*, 463 U.S. 745, 751, 752-54 (1983))).

So, too, the argument that Groedel was referring "to two attorneys only," is incorrect.  This is particularly clear from the very first question Groedel chose to ask when she began her cross-examination of Moore:

> MS. GROEDEL: You would agree that <u>typically for a plaintiff's attorney</u> who works on a contingency, they want to get more money, because what they get is contingent upon how much the total settlement is, right?

24

(Hrg. Tr. of October 27, 2006 at 75:10-13) (emphasis added).  Her next question was similar:

> MS. GROEDEL: But as a concept, wouldn't it be fair to say that plaintiffs' attorneys who work on a contingency have a greater incentive than those working on an hourly to get more money for their clients?

(*Id.* at 75:16-19) (emphasis added).  While it may be that Groedel only intended to assert that *these particular lawyers* did not zealously advocate on behalf of their client because *these particular lawyers* were only motivated by their own proprietary interest, those are not the words she used at the time.

Thomas also asserts that:

> This Court went on to demonstrate its inexplicable yet blatantly hostile attitude toward Plaintiff's new counsel in its February 20, 2009 Order when, on page 10, the Court erroneously states that, "Groedel selectively quoted from this Court's prior hearing, in order to argue that the Court cannot preclude consideration of any of the issues raised by the malpractice suit because this Court actually instructed Groedel to file it."  In fact, nowhere in the pleadings filed in this Court or in the state court did Thomas' counsel "argue... [that] this Court actually instructed" her to file a malpractice case.  Rather, the pleadings filed by Plaintiffs counsel with respect to the request for injunctive relief simply made reference to this Court's own verbiage. . .

(Thomas' Br. of February 27, 2009 at 11) (internal citations omitted).  Here, again, the Court has been accurate.  Thomas' initial brief employed a quote out of context to make it appear as if the Court had given Groedel explicit permission to file the state court malpractice action.  (Thomas' Br. of January 26, 2009 at 2, 5.)  That brief stated:

> **The Court did not state that it would retain jurisdiction over claims of malpractice** in the event Thomas pursued litigation against Friedman or Moore.  **In fact**, during the 60(b) hearing, **this Honorable Court specifically stated**, "**but if you are going to throw around ethical allegations, then you can do that in a different context than here.**"
> . . .
> [T]he State malpractice case will not "undo" this Honorable Court's November 30, 2006 Opinion and Order, which stated that the elements for setting aside the judgment entry had not been met.  In fact, this Honorable Court specifically stated it would not address issues involving "ethical allegations," ant that Thomas "can do that in a different context than here."

(*Id.*) (final emphasis in original). In his original brief, then, Thomas argued that the Court should not enjoin any portion of the state malpractice trial because the Court actually instructed Groedel that she could raise ethical allocations in a state malpractice action. The Court considers this to be selective quotation of its language, because the Court's expression of surprise at the argument that "as a concept," contingency lawyers have a greater interest in their client's success was not permission to relitigate factual issues decided by this court in a state court malpractice action.

Finally, Thomas argues:

> [N]owhere in the 60(B) hearing did Plaintiff's counsel make any ethical allegations, and certainly there is no evidence in the transcript of Plaintiff's counsel making any "inappropriate ethical allegations towards one of the Defendants' witnesses, Moore."

(Thomas' Br. of February 27, 2009 at 11) (internal citations omitted). This argument is false. For example, during the 60(b) hearing, Groedel inquired:

> MS. GROEDEL: It didn't matter to you how much the case settled for, because you had no proprietary interest. Calvin already had paid you thousands and thousands of dollars, right?
>
> MS. MOORE: It did matter to me, because I have an ethical obligation to zealously represent my client.
> . . .
> MS. MOORE: Your Honor, if I may, given that Ms. Groedel is making allegations against me with respect to ethics . . . I would like an opportunity to contact counsel, and have counsel available to me and present.

(Hrg. Tr. of November 30, 2006 at 75:21 – 77:5.) The record shows that Groedel made serious ethical allegations during the 60(b) hearing.[24] What the cold record does not reveal, moreover, is the tone and manner in which those allegations were made – both of which were hostile and accusatory.[25]

---

[24] The Court, again, reaches no conclusion on whether those ethical allegations may ultimately prove to be correct. They were, however, inappropriate as they were made during the 60(b) hearing.

[25] Frankly, given this Court's past positive experiences with Groedel, the Court was stunned by the entire exchange.

### 4.  The Court's References to Thomas' Current Counsel by Name are Appropriate

Thomas, last, finds it inappropriate that Groedel is the only current counsel of record to whom this Court refers repeatedly by name (*id.* at 11 ("[A]lthough there have been statements made on the record in this matter by five attorneys . . ., this Court found fit to mention only "Groedel" by name . . . no less than 11 times.")).  He is incorrect to perceive this as an expression of antagonism towards his current counsel.  The Court refers to Groedel by name so as to distinguish Thomas' current counsel (Groedel) from Thomas' former counsel (Friedman and Moore) and to discuss certain particular statements by Groedel that partially dictated how the earlier proceedings before this Court were conducted.[26]

## VI. THOMAS' ARGUMENT THAT THE COURT'S STATEMENTS DURING THE 60(b) HEARING WERE ERRONEOUS IS UNTIMELY

One issue raised in Thomas' current brief, although not tied to any request for relief, bears special mention.  Thomas argued:

> [T]his Court made a number of erroneous statements during the 60(B) hearing, which Plaintiff's counsel will not reiterate item by item it is important to note that, although this Court stated quite plainly to Mr. Friedman that it believes the bringing of the 60(B) Motion was a "threat that [had] been made" against Friedman, the fact is: there were absolutely no threats made during the hearing other than any made or implied by this Court towards Plaintiff's counsel.

(Thomas' Br. of February 27 at 13.)  This argument <u>badly</u> mischaracterizes what the Court said at the hearing.  The statement in question was made just prior to the point in the 60(b) hearing when Friedman began questioning Thomas:

> The COURT: I want to make it clear. Not only do I believe that by virtue of this motion **and the threats that have been made with respect to actions against you** that the plaintiff has not only waived privilege as to all of these settlement-related issues, but by virtue of his testimony discussing them, he has also waived them, and also waived any claim of conflict from you questioning him as it relates to you questioning him on the stand.

---

[26] In this Order, the Court sometimes refers to Groedel as "Thomas' current counsel" and sometimes as "Groedel."  The choice between the two is driven by the desire for clarity.

MR. FRIEDMAN: Thank you, Your Honor.

[THOMAS]: What does that mean?

The Court: That means he is allowed to question you, and that you can say what happened and can't prevent him from saying what happened.

(Hrg. Tr. of October 27, 2006 at 28:13-25) (emphasis added).  The Court was explicitly referring to the threat of a possible malpractice action, not the 60(b) motion.  The Court, moreover, was <u>required</u> to analyze the privilege issue by considering the extent to which Thomas was attacking Friedman's performance and the "threat" of any repercussions to Friedman in light of those attacks.

The Court notes, too, that this argument is untimely.  If Thomas had concerns about this Court's conclusions or statements in 2006, he had ample opportunity to raise them at that time, either through a motion for reconsideration or an appeal to the Sixth Circuit.  Having then chosen not to contest the accuracy of any of the Court's findings, he cannot now claim that the Court "made a number of erroneous statements" during the 60(b) hearing.[27]

## VII.    THE COURT WILL NOT SANCTION GROEDEL, AND DECLINES TO EXERCISE JURISDICTION OVER THE MALPRACTICE ACTION

Friedman asks that this Court sanction Groedel for her arguments.  It is clear that the Court could, and very arguably *should* order sanctions.[28]  The Court does not do so today in the hope that declining to order sanctions will forestall additional "litigation about litigation."  The Court encourages all counsel to behave in the future with a dignity deserving of the judicial forums in which they have chosen to appear.

---

[27] Even assuming Thomas had contested any of the Court's conclusions at that time, however, it would have been frivolous to make the bald assertion that the Court had made "numerous erroneous statements."

[28] Much of the opposition to the motion for sanctions is focused on the strength of Thomas' malpractice claims.  Many of the allegations raised in those pages are, if true, highly disturbing.  They do not, however, allow Thomas's counsel to make frivolous arguments.

Sanctions are warranted when "an attorney objectively 'falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" *Followell v. Mills*, No. 07-6504, 2009 U.S. App. LEXIS 5930, at *30-31 (6th Cir. March 18, 2009) (quoting *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006)); *see also Elfelt v. United States*, 149 Fed. Appx. 402, 410 (6th Cir. 2005) ("Sanctions may be awarded under § 1927 where an attorney knows, or reasonably should know, that a claim is frivolous."). The Sixth Circuit has explained that "[t]he purpose of sanctions under § 1927 is 'to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy.'" *Id.* Sanctions under § 1927 require more than negligence, or even incompetence, but they do not require subjective bad faith. *Id.* at 31. Indeed, "a court may sanction an attorney under § 1927 for unreasonably and vexatiously multiplying the proceedings despite the absence of any conscious impropriety." *Rentz v. Dynasty Apparel Indus.*, 556 F.3d 389, 396 (6th Cir. 2009). Sanctions may be imposed when there is "some conduct on the part of the subject attorney that trial judges, applying the collective wisdom of their experience on the bench, could agree falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party." *Royal Oak Entm't, LLC v. City of Royal Oak*, No. 07-1904, 2009 U.S. App. LEXIS 5439 (6th Cir. March 17, 2009) (quoting *Ridder v. City of Springfield*, 109 F.3d 288, 298 (6th Cir. 1997)).[29]

_____

[29] The Sixth Circuit recently noted an apparent conflict within its § 1927 jurisprudence:

There is tension within this court's jurisprudence as to the proper standard to apply in determining whether sanctions are warranted under § 1927. The district court relied upon the following standard set forth in *Wilson-Simmons v. Lake County Sheriff's Department*, 207 F.3d 818 (6th Cir. 2000):

Sanctions under § 1927 are warranted when an attorney has engaged in some sort of conduct that, from an objective standpoint, falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party. . . . [W]hen an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the

Groedel's arguments before this Court have been injudicious in a number of critical respects. First, and most importantly, Thomas' motion for reconsideration was not reasonably supportable under the law.  As explained above, the Court's determination that its 60(b) hearing considered such issues as whether Thomas "[k]nowingly authorized a settlement with Thistledown for $7,500" are not subject to attack based on the record of the case.  The Court has already observed, indeed, that the primary thrust of Plaintiff's 60(b) motion was the factual assertion that he had not agreed to nor authorized the settlement and dismissal of his claims against Thistledown for $7,500 and a non-retaliation agreement.  It is frivolous to claim that this issue was not "actually litigated."

So, too, Groedel's argument that she should not be held accountable for voicing her client's opinions is unsupportable by law and the ethical rules.  Similarly, Groedel's assertion that "nowhere in the 60(B) [sic] hearing did [Groedel] make any ethical allegations," is, as explained above, false.  It is unreasonable to make the Movants bear the cost of responding to such arguments.[30]

---

litigation of nonfrivolous claims, a trial court does not err by assessing fees attributable to such actions against the attorney.  Bad faith is not required to support a sanction under § 1927.

*Id*. at 824 (citations and internal quotation marks omitted).

A more recent case, however, states that sanctions are appropriate under § 1927 only where the attorney "intentionally abuses the judicial process or knowingly disregards the risk that his actions will needlessly multiply proceedings."  *Red Carpet Studios*, 465 F.3d at 646.

*Garner v. Cuyahoga County Juvenile Court*, 554 F.3d 624, 645 (6th Cir. 2009).  This Court is bound by the earlier precedent absent instruction from the Sixth Circuit to the contrary.  *Cf. White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 241 (6th Cir. 2005) ("When an opinion of this court conflicts with an earlier precedent, we are bound by the earliest case.") (citations omitted); *Habich v. City of Dearborn*, 331 F.3d 524, 530 (6th Cir. 2003) (same).  The Court would, however, consider an award sanctions well-within its discretion under the standard articulated in *Red Carpet*, as well.

[30] Although not included in this order for sanctions, it is noteworthy that some of the allegations made in Thomas' motion for sanctions are also frivolous.  It is, as explained below, capricious to move for sanctions alleging that opposing counsel has <u>lied</u> to the Court in part because the opposing attorney mistakenly identified Thomas' sister as "Julie" instead of "Jackie."

Finally, while an attorney may certainly disagree with a Court and while it is the better practice for courts to give attorneys "in the heat of the moment" a reasonable degree of latitude, the Court finds it inappropriate for counsel to accuse a Court of bias in the particular manner done so here – by accusing this Court of "venom" towards counsel when the record reveals that the Court properly concluded that many of counsel's arguments were not professionally appropriate.  The presence of such language is particularly noteworthy in light of Thomas' motion for sanctions against Sammon, discussed below.  It also supports a fair inference that a large motive behind the motion for reconsideration was to provide a vehicle for counsel to express her frustrations with the Court, thereby multiplying litigation well beyond any reasonable point.[31]

Ultimately, the Court believes that a sanction would be appropriate, and is arguably necessary, in light of the unnecessary cost and expense incurred by Friedman and Moore in responding to the motion for reconsideration and Thomas' own motion for sanctions.  Nevertheless, as previously explained, the Court declines to issue sanctions at this time, in part because Friedman's counsel Sammon is guilty of fueling some of the aggressiveness in Thomas' filing with his own aggressive language and use of hyperbole.

In his motion for sanctions, Friedman also asks this Court to take jurisdiction of the malpractice action, an invitation that the Court declines.  While it is true that the Court has been troubled by many of Thomas' arguments as well as Thomas' attempts to avoid the factual conclusions reached by this Court during its 60(b) hearing, such concerns do not justify the dramatic step of removing jurisdiction from the

---

[31] Indeed, Groedel began the earliest proceedings before this Court with the attack on another. Specifically, at the October 27, 2006 60(b) hearing, Thomas' counsel argued that she believed that the then-recently deceased Judge Manos likely engaged in improprieties with Thomas because she personally had witnessed Judge Manos engage in improprieties in unrelated cases.  (*See* Hrg. Tr. of October 27, 2006 at 6:6-7:1.)  Sadly, counsel apparently does not shy away from on the record attacks on judicial officers.

state courts.  The Court, indeed, has the utmost faith in the state courts generally, and, based upon his handling of the case to this point, Judge Corrigan specifically, to wisely and justly administer this case.

## VIII.   THOMAS' MOTION FOR SANCTIONS IS ALSO DENIED

Thomas' motion for sanctions against Sammon is not well-taken.  Thomas asserts three grounds for sanctions: (1) Sammon's alleged false statements; (2) Sammon's unsupported accusations; (3) Sammon's use of inflammatory and invective language.  The first two allegations include claims that are frivolous and the Court finds that Sammon's language is, although aggressive, not independently sanctionable.[32]

While the Court declines to discuss each of the fifteen statements with which Thomas takes offense, it is appropriate to discuss their general thrust.  First, Thomas makes certain allegations about Sammon that, although technically accurate, simply do not rise to the level of sanctionable conduct.  For example, Thomas argues that Sammon has made a false statement to this Court because, in a footnote, Sammon refers to "Thomas' sister Julie," when in fact Thomas has no sister Julie.  (Thomas' Br. of March 19, 2009 at 2.)  Sammon, obviously, made a mistake – Thomas' sister is Jackie, not Julie.  While Sammon's statement was technically "false," it is assuredly not the type of false statement with which this Court is concerned.[33]  Similarly, Thomas complains that Sammon refers to his current counsel by name.  (*Id*. at 2.)  As this court has already discussed, there is not necessarily anything improper about

---

[32] The content of Thomas' motion, as noted, would support an order of sanctions against Thomas and his counsel.

[33] The Court, as well, surely does not take offense that Sammon at one point mistakenly referred to Plaintiffs rather than Plaintiff.  Conversely, one argument by Sammon does merit particular mention. It is clear that he went too far when he argued that "[there is] overwhelming sworn testimony by Calvin Thomas that he did understand [the settlement], but suffered *post hoc* buyer's remorse."  (Thomas' Br. of March 19, 2009 at 1.)  Thomas did not directly testify in this manner, rather, the Court concluded that Thomas understood the settlement and suffered buyer's remorse based on the entire record.  Thus, while Sammon's fundamental point was not inaccurate, his description of the record was clearly an overstatement.

referring to counsel by name, particularly in this case, where it is necessary to distinguish between current and former counsel for the same litigant.  Finally, Thomas lists several arguments that he finds "outrageous, sarcastic, abusive, and malicious."  (*Id.* at 4)  While the Court agrees that many of Sammon's comments are unnecessary and inappropriate, they are not independently sanctionable – many of them, for example, contain factual and defensible positions ultimately adopted by the Court in this Order.  Some of Sammon's commentary does go further than is prudent and surely does not represent the profession at its best.  Imprudent comments directed at opposing counsel, standing alone, however, do not usually merit sanction.

Second, Thomas makes certain allegations without proper support.  For example, Thomas complains about Sammon's description of the manner in which a tape-recording was created, yet does not cite the portion of Sammon's argument in which Sammon references that tape-recording, nor cite the record of this case to allow the court to determine how this tape-recording was created.  (Thomas' Br. of March 19, 2009 at 3.)  It simply is not the independent obligation of a court to scour the record in order to determine whether a particular assertion, offered without citation, has merit.  So, too, Thomas argues that Sammon should be sanctioned, in part, for suggesting that this Court exercise jurisdiction over the state court malpractice action.  The Court is unaware of any authority that would support such a proposition.

Third, and most unsupportable, Thomas asks that the Court sanction Sammon for reaching the very same conclusions as the Court itself.  For example, Thomas argues that "[t]here is not a shred of evidence . . . that Plaintiff understood what happened at the settlement conference with Judge Manos or any of the ramifications thereof."  (*Id.* at 1-2.)  Of course, the Court has already concluded to the contrary.  Thomas, moreover, made this argument in support of sanctions of opposing counsel.  Even if the Court were to have agreed with Thomas' position that he did not understand the settlement, it would still have been inappropriate to move for sanctions on the ground that there was "not a shred of evidence"

in support of the contrary position.  So, too, Thomas moves for sanctions based on Sammon's assertion that an associate from Groedel's firm "misconstrued the [60(b)] [h]earing."  The Court has concluded, however, that Thomas' legal team did indeed misconstrue the 60(b) hearing.  It is, consequently, inappropriate to move for sanctions against Sammon for stating precisely what the Court concluded.  (*Cf. also* Hrg. Tr. of February 4, 2009 at 28:21-22 (statement of the Court to co-counsel for Thomas) ("Trust me, you weren't [at the 60(b) hearing].  That's not what was said.").[34]  Thomas has not articulated grounds under which this Court should sanction Sammon.[35]

## IX. CONCLUSION

For the aforementioned reasons, this Court **GRANTS IN PART AND DENIES IN PART** the Motions for Injunctive Relief (Docs. 39, 41), **GRANTS** Friedman's Motion to Supplement the Record (Doc. 59), **DENIES** Thomas' Motion to Strike (Doc. 60), **GRANTS** Thomas' Motion to Supplement the Record (Doc. 61), **DENIES** Thomas' Motion for Reconsideration (Doc. 63), finds **MOOT** Friedman's Motion to Stay (Doc. 64), **DENIES** Friedman's Motion for Sanctions (Doc. 65), and **DENIES** Thomas' Motion for Sanctions (Doc. 70).

Accordingly, Thomas and his counsel are **PERMANENTLY ENJOINED** from claiming before Judge Corrigan or before any other judicial tribunal that Thomas did not: (1) knowingly authorize a settlement with Thistledown for $7,500 and an agreement by Thistledown that it would not retaliate

---

[34] The Court explicitly declines to analyze on the record Thomas' other grounds for sanctions involving Sammon's description of Attorney Chastity L. Christy's ("Christy") response to the Court's questioning.  The Court is mindful of the challenges faced by young attorneys entering court and finds no merit in discussing this issue in depth.  The Court notes simply Sammon's summary of the record in this regard, although far from charitable and unnecessarily detailed, is not sanctionable.  (*See, e.g.*, Hrg. Tr. of February 4, 2009 at 21:10-12; *id*. at 26:2; *cf. id*. at 28:21-23; *id*. at 30:22-24).

[35] The Court is compelled, however, to urge both counsel to tone down the rhetoric in this case.  Counsel need to keep in mind that they are officers of the Court and representatives of a profession with a long and dignified tradition.  They should behave in a way that acknowledges those roles and is respectful of their importance.

against Thomas; (2) personally inform Judge Manos that he would agree to settle his claims on those terms; (3) understand that Thistledown would not take employment taxes out of the $7500; (4) understand that the settlement was compensation for his allegations of hedonic damages; (5) understand that these promises by Thistledown were in return for an agreement by plaintiff to dismiss his then-pending claims with prejudice.  The same parties are also **PERMANETLY ENJOINED** from asserting any claim contrary to the following three previous findings of this Court: (1) acting as plaintiffs agent, counsel made a conscious decision to stipulate to the filing of a judgment entry reflecting that the case was to be designated as settled and dismissed with prejudice; (2) the response to Defendant's Motion for Summary Judgment was not due as of the date of the settlement conference; (3) the settlement mooted the need to file any response to Defendants' motion.[36]

**IT IS SO ORDERED.**

                                                           s/Kathleen M. O'Malley
                                                           **KATHLEEN McDONALD O'MALLEY**
                                                           **UNITED STATES DISTRICT JUDGE**

**Dated: September 29, 2009**

---

[36] As to point number (1), it is important not to lose sight of the fact that Thomas' 60(b) motion sought an order setting aside a settlement with Thistledown and reinstating that action.  Whatever his complaints about Friedman and/or Moore, this Court was required to, and did, assess Thomas' motion as one between him and Thistledown.

35